[Civil No. 1227.   Filed June 14, 1912.]

[125 Pac. 709.]

## THE WEBSTER BROTHERS MILLING COMPANY, a Corporation, Appellant, v. WILLIAM R. BINGHAM, WILLIAM BINGHAM, WALLACE BINGHAM AND OLIVER BINGHAM, as Copartners Doing Business Under the Firm Name and Style of THE BINGHAM THRESHER COMPANY, Appellees.

1. SALES—ACTION FOR PRICE—EVIDENCE—SUFFICIENCY.—In an action against a milling company for price of wheat which was destroyed by fire, where plaintiff claimed that the wheat had been sold to the defendant, and defendant claimed that it was holding the wheat merely as bailor, *held* that, under the evidence, the question should have been submitted to the jury.

2. SALES—ACTION FOR PRICE—EVIDENCE—ADMISSIBILITY.—In an action for price of wheat, which, after being stored with a milling company, was destroyed by fire, evidence that the defendant was carrying insurance on the grain in its mill is not admissible to show its ownership of the wheat, for warehousemen and bailees have the right to insure bailments for their protection against loss which might occur through the negligence of their servants, agents, or themselves.

3. SALES—ACTION FOR PRICE—EVIDENCE.—In an action against a milling company for the price of grain, which, after being stored at the mill, was destroyed by fire, where defendant claimed it was bailee only, proof that the company had sufficient grain at the time of the fire to return all grain in storage was properly refused, where there was no agreement that the grain in suit might be commingled with other grain, and no custom to that effect was shown.

APPEAL from a judgment of the District Court of the Fifth Judicial District, in and for the County of Graham. E. W. Lewis, Judge. Reversed and remanded.

### STATEMENT OF FACTS BY THE COURT.

This action grows out of the following facts:

The appellant, Webster Brothers Milling Company, an Arizona corporation, was engaged in the business of general milling and the buying and selling of grain and hay at Thatcher, Arizona, during the month of June, 1910, and for some years prior thereto. W. R. Bingham, one of the partners of the appellees, about June 2, 1910, and Oscar Webster, an officer of appellant, had a conversation which Bingham says, as near as he can recall, was as follows: "I asked Mr. Oscar Webster what we would do with the grain, as there had been no price set on grain at that time. I had been in the habit for a good many years of always putting my grain in the mill, and he said: 'There has been no price set on grain.' I said: 'What are we going to do about it?' He says: 'You can put it in the mill, and I will give you the going price, or you can store it.' This was the first conversation I had with him about the grain. About five days after that, I think it was, I had been putting some grain in the mill, and I told him that we had to have some money to pay our expenses, and that my grain would go at the going price, and that I had to have some money to pay my men, and he says, 'All right.' I said, 'I would like to get some money now.' He says, 'I have made arrangements. I am a little short of money, but I have made arrangements for money.' I think he said in regard to all moneys, and he wanted to know if I could get along for the present with $50. I said 'Yes,' and he gave me $50. About five days later after that, I went in again, I think it was on the next Saturday night, and asked him for some more money. I told him I needed some more money to pay off my men. He said, 'I didn't get my money,' so he paid me $100 more." On cross-examination the same witness testified: "I asked him (Webster) if there had been any price set on grain, and he said, 'No,' and he asked what we were going to do with our grain. He says: 'You can put it in the mill, and I will pay you the going price, or you can store it.' Had no other conversation at this time other than I have stated. I commenced to haul grain right at that time, but cannot state whether or not I commenced to haul before we had any additional conversations. I had hauled some grain, though, prior to my

second conversation. No one present at these conversations. He and I were alone. We had no more conversations, except I asked him for money.''

The mill and its contents were destroyed by fire on the twenty-third day of June, 1910. Appellees took memorandum receipts of grain as it was stored in the mill, and these receipts were introduced as part of Bingham's testimony, and appended to the receipt was this writing: ''This is not a final receipt only a memorandum of your sacks and the amount of grain received by us less screenings and shrinkage. Please retain this slip for final settlement.'' The above constitutes all of the evidence of appellees bearing on the contract or agreement between the parties.

Webster, on behalf of appellant, testified as follows: ''He [Bingham] says, 'Webster, what about this grain?' . . . I says, 'What about it?' He says, 'The price is pretty low, and I don't want to sell for that price.' He says, 'I have got a payment to make on my machine in September some time, and I don't have to sell until that time, and I would rather make some arrangements to store it.' I said, 'All right, you can store the grain here until threshing is all over with, and you can come then and we will settle up.' And I said, 'I will give you the price at the time we settle up. If the grain rises, you can have the price of the grain.' He says, 'What about my running expenses?' I said, 'You can draw expenses for necessaries and coal. As you draw this money, we will take the grain for that amount at the going price.' ''

The fifteen thousand and forty pounds of wheat disposed of by appellant was loaded on board cars by appellees from wagons and shipped to Globe by appellant. It was not stored in appellant's mill at any time. He further stated that appellees were given credit for grain shipped or disposed of, and that soon after the fire they demanded pay for all of the grain stored. It was in evidence that it was customary for the farmers to store wheat and barley with appellant; that at the time of the fire different people had grain stored with it for which no charge was made. He further testified: ''When we gave the storage receipt, the receipt said we wasn't responsible for grain lost by fire. We gave them a memorandum receipt until the grain was screened, and, when they re-

turned this receipt, we gave them a receipt for storage. Mr. Bingham's grain had not been screened."

J. J. Birdno testified for appellant to certain admissions of Wallace and Rube Bingham; Wallace saying on the day of the fire, "they would be the heaviest losers, that they had about $2,000 worth of grain stored in the mill." Birdno testified he saw and asked Rube Bingham the next day if what Wallace told him was true, and he said "Yes," they would lose about $2,000, but he did not believe the boys would let him lose it, or thought he was loser about $2,000.

Tom Moody, witness for appellant, testified that before the fire he had a conversation with Rube Bingham, in which, in answer to the question, "What are you getting for your grain this year?" Mr. Bingham said: " 'I am just drawing money for expenses and storing the balance to pay expenses at the regular price.' He says: 'I am drawing money to pay my expenses and storing the balance for the regular price.' " Rube Bingham denied these conversations.

The foregoing is all the evidence touching the agreement of the parties hereto. But bearing on the transaction, and as appellees contended for the purpose of showing that appellant exercised acts of ownership of the grain in question, the court permitted appellees to show that appellant had $1,500 insurance on barley and $1,500 insurance on wheat or flour, and that the same was collected after the fire. The evidence is not clear on this point, as to whether this insurance covered the grain of appellees. Prior to the fire appellant had disposed of eighteen thousand five hundred and four pounds of barley at $1.10 per hundred-weight, and fifteen thousand and forty pounds of wheat at $1.40 per hundred-weight, and had entered credits to appellees for $415.21, the amount realized. Appellant had paid thereon in cash and coal $204.65 before the fire in June, and after the fire had paid in coal $73.46, leaving a balance due as admitted by appellant of $137.10. Appellees had stored and delivered to appellant 20,885 pounds of wheat, and 57,735 pounds of barley. Appellant offered to show that it had enough wheat and barley on hand to pay all storage wheat and barley at the time of the fire, but, on objection of appellees, this offer was disallowed.

On motion of appellees, a directed verdict was rendered against appellant for $649.37, which sum it is agreed is the

correct amount, provided the above facts constituted a sale of the grain to the appellant.

Messrs. Rawlins & Little, for Appellant.

Mr. Frederick S. Nave, for Appellees.

ROSS, J.—The appellant has made several assignments of error, most of which are too indefinite to call attention of this court to the errors assigned. We think that attorneys bringing cases to this court should be careful to observe that rule of the court which requires that "all assignments of error must distinctly specify each ground of error relied upon, and the particular ruling complained of." However, we think there is sufficient of substance in the assignments made by the appellant that we are able to examine the record in the following three respects: That the lower court committed errors (1) in instructing the jury to return a verdict for appellees; (2) in permitting appellees to prove that the appellant had insurance on wheat and barley in storage; and (3) in refusing the offer of evidence by appellant that it had on hand sufficient grain to return all storage grain.

1. It is the contention of appellees that the evidence conclusively shows that the transaction was a sale, and that the appellant was debtor to the appellees for the value of grain at the "going price," and the appellant insists that the transaction was a bailment. Whether it was one or the other depends upon the intention of the parties to the contract. Bingham, one of the appellees, testified that Webster, who was an officer of and represented the appellant in making the contract, said, "You can put it [the grain] in the mill, and I will give you the going price, or you can store it." From this language it cannot be said to be a sale. Appellees began at once to place their grain in appellant's mill, but did not announce then nor later whether they would take the "going price" or store the grain. Appellees did, however, a few days after ask for and were given $50 and a little later $100 by the appellant "to pay expenses." At the time of the first of these payments Bingham said that he told Webster that his grain "would go at the going price," and that he had to have some money to pay his men, and that Webster said all right. This evidence standing alone and uncontradicted might well

be construed as an election on the part of Bingham to sell his grain at the "going price," and an acquiescence therein by appellant. But Webster, for appellant, testified that Bingham said to him in the first conversation: " 'The price is pretty low, and I don't want to sell for that price. I have got a payment to make on my machine in September some time, and don't have to sell it until that time, and I would rather make some arrangements to store it.' I said: 'All right, you can store the grain here until threshing is all over with, and can come then and we will settle up. If the grain rises you can have the price of the grain.' He says: 'What about my running expenses?' I said: 'You can draw your expenses for necessaries and coal. As you draw this money, we will take the grain for that amount at the going price.' "

The statements of the transaction and the conversations between the parties involve a sharp conflict. Appellant's evidence, if believed, would show that the grain was taken by it in storage with the agreement and understanding that it might ship and dispose of certain portions, accounting to the appellees for the same at the going price, for which the appellant was to pay the appellees cash for running and necessary expenses and to supply the appellees with coal. Whatever grain was left over after these deductions was to be kept in storage until after the threshing was all done. As the grain was delivered at appellant's mill, receipts were issued to appellees, and on them was this statement: "This is not a final receipt only a memorandum of your sacks and the amount of grain received by us less screenings and shrinkage. Please retain this slip for final settlement." This does not purport to be a warehouseman's receipt, but a mere memorandum evidencing that appellant had received from appellees some grain to be held for shrinkage and screening. Webster testified that, after the screening, the memorandum receipt was returned and storage receipts were issued which provide that appellant "was not responsible for grain lost by fire." It will be seen that the weight of the grain upon which it was agreed that a settlement should be made had not been ascertained. The "shrinkage" contemplated had not been determined, nor had the depreciation in weight. The memorandum receipt then does not sustain the contention that the transaction was a sale, but tends to show a bailment only.

The evidence was that at the time of the fire other farmers had their grain stored with appellant and that it was customary for them to do so, and that appellees had stored their grain with it in previous years.

J. J. Birdno testified that Wallace and Rube Bingham told him after the fire that they were heavy losers. Tom Moody testified that Rube Bingham told him before the fire that his grain *was in storage* with appellant. It will be seen that there is a striking conflict in the evidence as to what the contract was, and, inasmuch as contracts of this kind are subject to the same rule as other contracts, the meeting of the minds of the parties, we think the question of sale or bailment should have been submitted to the jury.

2. The fact that the appellant was carrying insurance on the grain in its mill is not necessarily evidence of ownership. Warehousemen and bailees have a right to insure bailments for their protection against loss that might occur through the negligence or carelessless of their servants or agents or themselves. 19 Cyc. 586, note 20; *Dawson* v. *Waldheim,* 80 Mo. App. 52; *Pelzer Mfg. Co.* v. *Sun Fire Office,* 36 S. C. 213, 15 S. E. 562; *Baxter* v. *Hartford F. Ins. Co.* (C. C.), 12 Fed. 481. In a suit of this kind, brought and prosecuted upon a contract of sale, it is not competent as evidence of a sale to show that the defendant had insured the grain when the defendant denies the sale and alleges a contract of bailment, for, as above stated, he has a right to insure the bailed property.

3. The offer on the part of the appellant to show that it had in its mill grain sufficient to return all grain on storage at the time of fire was properly refused. Had the offer been to prove that appellant had all of the grain of appellees, except such as had been disposed of under agreement of the parties, it would have been error to refuse it. There is no evidence, however, of an agreement that the grain might be commingled with the grain of appellant and others with the right in the appellant to take from it at pleasure and appropriate it, on condition of its procuring other grain to supply the place of that taken, nor is any custom of that kind shown to exist in the community. If such had been the agreement or such a custom had been proved, the offer would have been proper. *Fleet* v. *Hertz,* 94 Am. St. Rep. 220, note B; *Rice*

v. *Nixon,* 97 Ind. 97, 49 Am. Rep. 430; Bretz v. *Diehl,* 117
Pa. 589, 2 Am. St. Rep. 706, 11 Atl. 893; *Dole* v. *Olmstead,*
36 Ill. 150, 85 Am. Dec. 397; *Hall* v. *Pillsbury,* 43 Minn. 33,
19 Am. St. Rep. 209, 7 L. R. A. 529, 44 N. W. 673.

Under all of the facts, we believe the jury might reason-
ably have found the transaction detailed by the witnesses
was a contract of bailment, and not of sale. The judgment
of the lower court is reversed, and the case is remanded to
the superior court of Graham county for a new trial.

FRANKLIN, C. J., and CUNNINGHAM, J., concur.

Application for rehearing denied.

NOTE.—As to who must bear loss if property is lost after sale but be-
fore payment, see note in 22 Am. St. Rep. 266.